# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JOHN S. PETERSON,**
                **Plaintiff,**

    v.                                               Case No. 13-C-0447

**MID-STATE GROUP, INC.,**
                **Defendant.**

## DECISION AND ORDER

John Peterson claims that Mid-State Group, Inc., terminated his employment in violation of the Age Discrimination in Employment Act ("ADEA"). Before me now is Mid-State's motion for summary judgment.

## I. BACKGROUND

In 1989, Schmidt Implement Company, a farm-equipment dealership located in Salem, Wisconsin, hired John Peterson to be its service manager. He would go on to manage the service department at Schmidt for 23 years. In the early spring of 2012, Mid-State purchased Schmidt Implement's assets. At the time of the purchase, Mid-State operated several other dealerships in Southern Wisconsin, including a dealership located in Janesville, Wisconsin.

On March 13, 2012, Schmidt Implement held a meeting of all of its employees, at which it announced the sale of the business to Mid-State. Robert Schmidt, an owner of Schmidt Implement, stated that Schmidt employees would need to fill out an employment application and be interviewed by Mid-State, but that he anticipated that Mid-State would

hire all current Schmidt employees. Mid-State did not interview non-Schmidt employees for any position at the Salem location.

Peterson submitted an application to be kept on as the service manager at the Salem location. At this time he was 69 years old. He was interviewed by Christine Frodel, who was in charge of human resources at Mid-State, and Eric Stith, who was in charge of Mid-State's parts and service departments. According to Frodel and Stith, Peterson's interview did not go very well. Frodel states that Peterson was very quiet during his interview and that he was unenthusiastic about managing the service department for Mid-State. Frodel and Stith also state that they were concerned about Peterson's focus on his salary, the number of hours he would be required to work, and the amount of his vacation time. During the interview, Peterson indicated that the salary Mid-State was offering would result in his earning less than he had earned the previous year at Schmidt Implement. This was because Mid-State did not pay bonuses to its service managers, and Peterson's bonus for the previous year brought his total compensation at Schmidt Implement above the salary that Mid-State was offering. Peterson also expressed concern over the fact that he would receive three weeks of vacation time at Mid-State, rather than the four weeks he was used to at Schmidt, and that he would be expected to work two days per month more than he had been working at Schmidt.

At the end of the interview, and despite their stated concerns, Frodel and Stith formally offered to retain Peterson as the service manager at the Salem location. Because of the reduction in compensation and benefits, Peterson asked for some time to think about the offer and discuss it with his wife. Frodel and Stith agreed to this request. A short time later, Peterson met with Stith and accepted Mid-State's offer of employment. At that

time, however, Stith informed Peterson that he would be placed on a 90-day probationary period. Stith explained that at the end of the 90-day period, Mid-State would reevaluate Peterson and might terminate him or might give him a salary increase. Peterson did not ask why he was being placed on probation. Frodel and Stith state that they put Peterson on probation because they had concerns about his attitude and interest in the position.

In addition to Peterson, Mid-State hired all but one of the Schmidt Implement employees. The employee whom they did not hire was Duane Kellor, a part-time employee who handled marketing for Schmidt Implement. Kellor was 75 years old at the time, and the reason Mid-State gives for not hiring him is that it already had a full-time employee who handled marketing, and therefore Kellor's position was redundant. In total, Mid-State hired twenty Schmidt Implement employees. Thirteen of these employees were age 50 or older. The average age of the hired employees was 49.35, and the median age was 53. The oldest employee hired was 78, and the youngest two were 23. See Def. Prop. Finding of Fact ("PFOF") ¶ 29.

Mid-State officially took over the Salem location on April 1, 2012. Stith was in charge of integrating the Salem service department into Mid-State's existing parts-and-service operations. As part of this process, Stith had a new computer system installed at the Salem location. The computer system was the same system used at Mid-State's other locations, and use of the system allowed Mid-State to coordinate operations across its various locations. Stith asked Michelle Snyder, an employee in the service department at Mid-State's Janesville location, to train Peterson on the new system. Stith also asked Snyder to train Timothy Gaffron on the new system. Gaffron was hired by Schmidt approximately one year before Mid-State took over the Salem location. He was a "service

3

writer," which is a title given to an assistant in the service department. Gaffron was one of the twenty employees hired by Mid-State following the acquisition. He was 23 years old at the time.

Snyder was present at the Salem location for two or three days during the first week of April 2012. When she first arrived at the Salem location, she introduced herself to Peterson and Gaffron and gave them each a binder of documents. During the morning of her first day at the Salem location, Snyder trained Gaffron on how to use the computer system. This training lasted until about noon. After lunch, Snyder began training Peterson on how to use the computer system. However, because of a death in the family, Peterson had to leave at 3:30 p.m., and so his training lasted for approximately two hours. See Peterson Dep. at 82. The next day, Snyder was not present at the Salem location, and so Peterson received no training on the computer system that day. The day after that, Snyder made her final visit to the Salem location, but Peterson was not working that day because he was attending the funeral of the family member who had died. Snyder states that she was also present at the Salem location for another day when Peterson was present, but Peterson disputes this. According to Snyder, on this day she sat in between Peterson and Gaffron and answered any questions they had about the computer system as they came up.

According to Mid-State, Peterson had difficulty learning how to use the new computer system. Gaffron states that he observed Peterson having difficulties using the computer system. At one point, Snyder informed Stith that Peterson was not yet able to make a work order using the computer system or navigate the computer system on his own. Stith himself observed Peterson having difficulty using the computer system on one

4

occasion when he helped Peterson enter a time card into the system. Stith also heard Peterson making comments that he interpreted as negative comments about the need to use the new computer system. On one occasion, Peterson asked in reference to the computer system, "Why do we have to do it this way?" Def. PFOF ¶¶ 103–04. On another occasion, Peterson stated in reference to a task on the computer system that "we never had to do it this way before." Id. ¶¶ 105–06. On a third occasion, Peterson stated in reference to entering a time card on the computer system that he "didn't see how this was going to work." Id. ¶¶ 107–08.

Peterson does not deny that, during the first ten days or so after Mid-State took over the Salem location, he was having trouble with the computer system or that he made the comments identified above. He admits that at times he was confused and frustrated with the computer system. See Peterson Dep. at 86–87. However, he contends that he was having trouble because Mid-State had not given him enough training. He points out that he had only two hours of formal training with Snyder and that he expected to be sent to the Janesville location for additional training. Peterson believes that, with additional training and time to learn the system, he would have been able to use the system proficiently.

By April 10, 2012, Stith had formed the opinion that Peterson was incapable of learning the new computer system. He had also formed the opinion that Peterson had a negative attitude and was "resistant to change." Stith Aff., June 3, 2014, ¶ 15; Stith Dep. at 121. Late in the day on April 10th, Stith contacted Frodel and recommended that Peterson be terminated due to his inability to grasp the computer system and his negative attitude. After asking Stith if he was sure about this decision, Frodel gave Stith permission to terminate Peterson.

On April 11, 2012, Stith met with Peterson and informed him that he was terminated. Stith told Peterson that the reason for his termination was his failure to learn how to operate the computer system. Stith did not say that Peterson's attitude was a factor in the decision. Stith then completed a Mid-State "employment termination checklist" and wrote the following as the reason for termination: "We agreed to a 90 day probation to monitor progression. During this period of first two weeks, employee is unable to learn the new computer system to the level needed, so the decision was decided to terminate at this time." Def. PFOF ¶ 127.

Having terminated Peterson, Mid-State needed to hire someone else to be the service manager at the Salem location. According to Mid-State, it considered two alternatives: having the service manager at the Janesville location move to the Salem location, or having Gaffron take over as service manager. Frodel and Stith asked David Schmidt, a former owner of Schmidt Implement and current employee of Mid-State, what he thought about promoting Gaffron to service manager. Schmidt told them that Gaffron was a good service writer and that Schmidt had hired him as a potential replacement for Peterson when Peterson decided to retire. Def. PFOF ¶ 133. Schmidt's opinion was that Gaffron deserved to be considered for the position of service manager, but that he would need some additional training. Id. ¶ 135. Stith was impressed with Gaffron's educational background—he had a bachelor's of science in agricultural business—and he was impressed with the work Gaffron had done during the first ten days of the transition period from Schmidt Implement to Mid-State. Ultimately, Stith and Frodel decided to promote Gaffron to service manager.

6

According to Peterson, Frodel and Stith never considered having the Janesville service manager move to the Salem location. Instead, they intended all along to replace Peterson with Gaffron because they wanted a younger person in that position. Peterson thus commenced the present action, alleging age discrimination.

## II. DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

The ADEA prohibits the termination of an employee because of that employee's age. 29 U.S.C. § 623(a)(1). To succeed on his claim of age discrimination, Peterson must prove that age was the "but-for" cause of Mid-State's decision to terminate him. Gross v. FBL Fin. Servs. Inc., 557 U.S. 167, 176 (2009). To satisfy this burden, Peterson may use what are known as the direct and indirect methods of proof. Under the direct method, Peterson must point to direct or circumstantial evidence giving rise to an inference that Mid-State would not have terminated him but for his age, such as a relevant decisionmaker's statement that age was the reason for the termination. See, e.g., Martino v. MCI Commc'n Servs., Inc., 574 F.3d 447, 452 (2009); Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1088 (7th Cir. 2000). Because such proof can be difficult to come by, the Supreme Court has established the indirect, or burden-shifting, method of proof "as a means of evaluating indirect evidence of discrimination at the summary judgment stage."

7

Robin, 200 F.3d at 1088. Under this method, if the plaintiff presents sufficient evidence that establishes by a preponderance of the evidence a prima facie case of discrimination, a presumption of intentional discrimination arises. Id. To establish a prima facie case of age discrimination, a plaintiff must prove that (1) he was in the protected age group of 40 years or older, (2) he was performing his job within the legitimate expectations of his employer, (3) he was discharged, and (4) a substantially younger employee replaced him. Johnson v. Zema Sys. Corp., 170 F.3d 734, 746 (7th Cir. 1999).

If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to come forward with evidence of a legitimate and non-discriminatory reason for the employment decision. Robin, 200 F.3d at 1088. "At this point, the inference of discrimination disappears and the plaintiff must then prove, by a preponderance of the evidence, that the reasons proffered by the defendant were pretextual for intentional discrimination." Id. If the plaintiff fails to prove that the defendant's reason was a pretext for discrimination, then the defendant's motion for summary judgment must be granted.

In the present case, Peterson contends that he has presented sufficient evidence to survive summary judgment under either the direct or the indirect method of proof. However, given the arguments the parties make in this case, it does not make sense to separately analyze Peterson's claim under each method. Mid-State has come forward with evidence of legitimate and non-discriminatory reasons for having terminated Peterson and replaced him with a substantially younger person—namely, Peterson's inability to grasp the computer system and his resistance to change. Thus, to prevail under the indirect method, Peterson must show that these reasons were pretextual. The same evidence that Peterson uses to prove pretext is also circumstantial evidence that can be used to prove

8

intentional discrimination under the direct method. (In this case, there is no truly "direct" evidence of age discrimination, such as an admission that age was a factor in the decision to terminate Peterson.) Similarly, much of the evidence Peterson would use to prove his prima facie case is also circumstantial evidence of discrimination under the direct method. Thus, I will not further discuss the direct and indirect methods but simply ask whether a reasonable jury could find from the evidence Peterson has presented that Mid-State terminated him because of his age. See Martino, 574 F.3d at 452 (observing that distinction between direct and indirect methods is often fleeting, that under either method the bottom-line question is the same, and that much if not all of the same evidence is at play under either method).

As noted, Mid-State contends that it terminated Peterson because he was incapable of learning the computer system and was resistant to change. In determining whether there exists a genuine factual dispute over whether Mid-State terminated Peterson for these reasons rather than because of his age, I focus on the mental state of Stith. It was Stith who recommended Peterson's termination and who claims to have made the determinations that Peterson was incapable of learning the computer system and was resistant to change. Although Frodel approved Stith's recommendation and claims to have observed Peterson's negative attitude during his interview, the record allows a jury to reasonably infer that but for Stith's recommendation, Mid-State would not have terminated Peterson.

Stith's reasons for recommending Peterson's termination are consistent with common ageist stereotypes—namely, that older workers are "resistant to change" and are unable or unwilling to learn or adapt to new technology. See Harstel v. Keys, 87 F.3d 795,

802 (6th Cir. 1996) (stating that the assumption that "older workers are more resistant to change and are adverse to learning new methods . . . is the very type of ageist stereotype that the ADEA was enacted to address"); Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 734 (8th Cir. 1996) ("The ADEA was enacted to combat stereotypes regarding the ability of older employees to keep pace with changes in the work place."); O'Reilly v. Marina Dodge, Inc., 435 F. App'x 8, 12 (2d Cir. 2011) ("A common stereotype of elderly people is that they resist change and new approaches."); Barbara T. Lindemann & David D. Kadue, Age Discrimination in Employment Law 5 (2003) (identifying as stereotypical the view that "older workers are unable or unwilling to learn or adapt to new technology"). A jury could reasonably conclude that these stereotypes colored Stith's assessment of Peterson's abilities and attitude. It may be that because of these stereotypes, Stith was more likely to jump to the conclusion that Peterson would be unable to learn the new computer system and that he was resistant to the changes being made in the service department. Because of these stereotypes, Stith may have judged Peterson's performance and attitude more harshly than he would have judged the performance and attitude of a younger worker.

There is, to be sure, evidence in the record that supports Stith's assessment that Peterson was having trouble learning the new computer system and that he was unhappy with the changes being implemented by Mid-State. Peterson, by his own admission, was not a quick study on the new system, and he does not dispute making statements such as "why do we have to do it this way" and "we never had to do it this way before." But this evidence does not foreclose a reasonable jury from concluding that Stith, because he harbored ageist stereotypes, was too quick to conclude from Peterson's initial struggles that he was <u>incapable</u> of learning the new computer system. Unlike Stith, Michelle Snyder,

10

who trained Peterson on the computer system, did not think Peterson was incapable of learning the computer system. Snyder Dep. at 106. The jury could conclude that the difference in opinion between Stith and Snyder is explained by the fact that Stith was biased against older workers whereas Snyder was not. Likewise, the evidence in this case does not foreclose a reasonable jury from concluding that ageist stereotypes caused Stith to interpret Peterson's comments about the new system as an indication that Peterson was resistant to change. The jury could reasonably conclude that if Stith had observed, say, a 29-year-old employee having the same problems with the computer system and making comments similar to the ones Peterson made, he would have waited more than ten days before concluding that the employee was incapable of grasping the system and resistant to change. The jury could conclude that, because of Stith's stereotypical views, he simply assumed that Peterson's initial struggles were indicative of permanent deficiencies.

Mid-State might point out that there is no direct evidence in the record indicating that Stith was biased against older workers or harbored ageist stereotypes. But from the fact that Stith's reasons for terminating Peterson are common ageist stereotypes, and the fact that Stith terminated an experienced service manager with a record of success after only ten days under new management and replaced him with a much younger worker, the jury could reasonably infer that, but for the ageist stereotypes, Peterson would not have been terminated. If Stith had observed Peterson having substantial difficulties with the computer system after, say, a month of experience with the system, then perhaps an inference of age bias would not be reasonable. But here, the fact that Peterson was terminated after only ten days makes the inference of bias reasonable.

11

Mid-State argues that the so-called "same actor" inference works in its favor in this case. The idea behind this inference is that when the same person both hires and fires an older person, it is unlikely that the person is biased against older workers; if that person was biased, he would not have hired the older person in the first place. See, e.g., Martino, 574 F.3d at 454–55. In the present case, Stith was involved in the decision to hire Peterson, and only a few weeks elapsed between the time Stith agreed to hire Peterson and when he terminated him. Mid-State contends that this supports an inference that Stith was not biased against Peterson because of his age. However, even if the same-actor inference could reasonably be drawn in this case, it would be inappropriate to draw it at the summary-judgment stage, since at that stage all reasonable inferences are to be drawn in favor of the nonmovant. See Petts v. Rockledge Furniture LLC, 534 F.3d 715, 724–25 (7th Cir. 2008); Filar v. Bd. of Educ. of City of Chicago, 526 F.3d 1054, 1065 n.4 (7th Cir. 2008). Mid-State may, of course, argue to the jury that Stith would not have hired Peterson in the first place if he harbored ageist stereotypes, but it is for the jury, not me, to decide whether that is true. Moreover, in this case the same-actor inference is weakened by the fact that Stith had his doubts about Peterson's attitude at the time of hire. The doubts he had at that time could have been based on the stereotype that older workers are resistant to change. The jury could reasonably conclude that when Peterson exhibited minimal behavior that was consistent with the stereotype, Stith jumped to the conclusion that Peterson was too old to adapt to Mid-State's way of running a service department. Accordingly, the same-actor inference does not entitle Mid-State to summary judgment.

Mid-State also argues that Stith's having hired almost the entire Schmidt Implement service and parts staff, which was composed primarily of older workers, is inconsistent with

a bias against older workers. Mid-State is certainly entitled to present this argument to the jury, but it does not entitle Mid-State to summary judgment. When Mid-State took over the Salem location, there were fifteen workers in the parts and service department, and ten of them were over age 50. <u>See</u> Def. PFOF ¶¶ 20, 29. Even if Stith was biased against older workers, it would have been impractical for him to immediately replace all ten of the older workers in the Salem parts and service department when Mid-State took over the business. Thus, Stith's hiring of nearly all of Schmidt Implement's older workers does not prove that he was not biased against such workers.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file a sur-reply brief is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 10th day of October, 2014.

                       s/ Lynn Adelman
                       _____
                       LYNN ADELMAN
                       District Judge